[Cite as *In re J.G.*, 2020-Ohio-4701.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re Adoption of J.G., K.W.

Court of Appeals No.   L-20-1023
L-20-1024

Trial Court No.        2018 ADP 000142
2018 ADP 000143


**DECISION AND JUDGMENT**

Decided:  September 30, 2020


* * * * *

John F. Potts, for appellant.

David T. Rudebock, for appellee

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, appellants, T.B. and D.B., appeal the January 6, 2020 judgments of the Lucas County Court of Common Pleas, Probate Division, denying their petition to adopt their great-grandchildren, J.G. and K.W.  Appellee, Lucas County

Children's Services ("LCCS"), has filed a brief urging us to affirm the trial court judgments. For the following reasons, we affirm, in part, and reverse, in part, and remand this matter to the probate court for further proceedings.

## I. Background

{¶ 2} J.G. (born in 2012) and K.W. (born in 2016) are the biological children of Jo.G. On December 12, 2017, Jo.G.'s parental rights were terminated and permanent custody of the children was granted to LCCS. The children have been in foster care with a distant cousin, B.G, since August of 2016.

{¶ 3} On September 5, 2018, T.B. and D.B., the children's maternal great-grandparents, filed a petition for adoption. LCCS objected to their petition. It argued that B.G. has taken good care of the children, has been a consistent, stable presence in their lives, and has expressed an interest in adopting them, while T.B. and D.B. have never held custody of them, have not maintained consistent contact, have not represented a consistent, stable presence in their lives, have not approached LCCS to be studied for adoption, and have not presented LCCS with an approved adoptive home study. It maintained that the children's placement with T.B. and D.B. would not be the "least detrimental alternative" for the children and would not be in their best interest. LCCS also expressed concern that T.B. and D.B. intended to return the children to their mother, and it alleged that D.B. had at one time been approved to babysit J.G. with certain restrictions, but she violated those restrictions and lied to the caseworker about it. LCCS

2.

noted that T.B. and D.B. sought custody in the juvenile court case, but the juvenile court granted custody to LCCS.[1]

{¶ 4} In a judgment journalized on January 3, 2019, the trial court granted LCCS's objection and dismissed the petition after T.B. and D.B. failed to appear for a pre-trial, notify the court of their legal representation, provide a deposit for their home study, or respond to LCCS's objection. T.B. and D.B. moved to vacate the judgment and reinstate their petition to its docket, and the trial court granted their motion. The matter proceeded to hearing.

## A. The Hearing

{¶ 5} A hearing took place on November 25-26, 2019, "on the issue of whether [LCCS] is unreasonably withholding its consent" to T.B. and D.B.'s petition to adopt. The following witnesses testified: D.B.; T.B.; B.G.; Danielle Stroble and Rick Mendieta, LCCS ongoing caseworkers; Linda Baker, an LCCS adoption caseworker; attorney Mary Clark, the children's guardian ad litem ("GAL"); J.E., the children's maternal grandmother; A.H., the children's half-sister; N.H., a family friend; N.M, the children's uncle; F.G., the children's cousin; C.B., T.B.'s son and D.B.'s stepson; and C.R., a cousin of D.B.

### 1. Danielle Stroble

{¶ 6} Danielle Stroble is employed by LCCS as an ongoing caseworker. She was assigned J.G. and K.W.'s case on March 7, 2016, when it went from an investigation to

---

[1] We affirmed the juvenile court judgment. *In re J.G.,* 6th Dist. Lucas No. L-17-1311, 2018-Ohio-3981.

3.

an ongoing case. She was taken off the case in May of 2016, because maternal family members—A.H., specifically—made personal threats against her.

{¶ 7} J.G. and K.W. were removed from their home because of domestic violence between Jo.G. and K.W.'s father, M.W. Once involved, LCCS became aware of drug issues and instability in the household. J.G. was placed with J.E., her maternal grandmother. Jo.G. was pregnant with K.W. at that time.

{¶ 8} When K.W. was born, the agency originally planned to place K.W. with J.E. But the agency learned that J.E. had allowed J.G. to stay the night unsupervised at Jo.G.'s home, and a new domestic violence incident occurred in J.G.'s presence. J.E. could no longer be trusted at this point. The agency obtained an ex parte order for custody and talked to the family about other relatives who could provide foster care. To Stroble's knowledge, T.B. and D.B. did not ask to be considered.

{¶ 9} When J.G. was living with J.E., Stroble spoke with D.B. about being a support for J.E. This could include babysitting and overseeing visits between Jo.G. and the children. D.B. and T.B. submitted fingerprints for a background check. The results came back and arrangements were made for D.B. to babysit J.G. on April 3, 2016, at J.E.'s home; J.E. would be attending a staffing meeting at the hospital following K.W.'s birth. D.B. was not permitted to babysit in her own home because a sight and safety check of D.B. and T.B.'s home was required and had not yet been performed.

{¶ 10} Instead of staying at J.E.'s home with J.G., D.B. showed up at the hospital for the staffing meeting. Stroble asked D.B. where J.G. was, and D.B. told Stroble that

4.

T.B. was watching J.G. at their home. Stroble said that D.B. knew that this was not permitted because the home had not yet been approved.

{¶ 11} Despite this rule violation, LCCS continued to consider D.B. to be a support for the family. Stroble explained to D.B. that they were trusting her to follow the rules and procedures of the agency. She said that D.B., J.E., and Jo.G. all understood that they needed to follow the rules. But a few days later, J.E. and Jo.G. waited for Stroble outside court. Stroble asked who was with J.G. J.E. and Jo.G admitted that D.B. was watching J.G. at D.B.'s home, which had still not been approved. Stroble called D.B. and asked if J.G. had been to her home and D.B. said no. She did not tell Stroble the truth— that J.G. was there and had spent the night—until Stroble told her that J.E. and Jo.G. had already admitted that J.G. was there. At this point, LCCS concluded that D.B. could not be trusted and could not provide oversight.

{¶ 12} After D.B. lied to Stroble, it was not determined that she could have no further involvement with the kids; it was merely determined that she could not be approved as an oversight or babysitter. T.B. and D.B. never asked Stroble about placing the children with them, so she cannot say that they would not have been considered for placement, but she acknowledged that an even greater level of trust would be required to place the children with them.

{¶ 13} Stroble testified that she is not aware of D.B. or T.B. ever sending cards or letters to the children. On cross-examination, she agreed that while D.B. could not take J.G. to her own home, she would have been permitted to take her to a public place like

5.

the zoo or COSI.  Stroble emphasized that if the child was going to be taken to a private home, this needed to be discussed with a supervisor.

## 2.  Rick Mendieta

{¶ 14} Rick Mendieta is also employed by LCCS as an ongoing caseworker.  He was assigned to J.G. and K.W.'s case on May 24, 2017.  Cristina Disilvis was the children's caseworker in between Stroble and Mendieta.  By the time Mendieta was assigned to the case, LCCS had already been awarded permanent custody of the children.

{¶ 15} J.G. and K.W. have been in B.G.'s home since August 5, 2016.  Mendieta conducts monthly home visits, some of which are unannounced.  He talks with J.G. alone, but K.W. is too young for an alone interview.  J.G. has been tired lately and refuses to talk, but they usually discuss school and any concerns she may have.  Of the approximately 30 times he has visited, J.G. has refused to talk to him only four or five times.  She has not relayed any concerns about her living environment.

{¶ 16} J.G. is in second grade.  She is feisty and stubborn and has a mind of her own.  She has had minor issues with her peers, but overall she gets very good grades.  She is not involved in extracurricular activities.  J.G. was in counseling, but that has been successfully completed.  J.G. sometimes talks about Jo.G. and J.E.; she talks more about J.E. than Jo.G.  Recently, they showed up at her school and that embarrassed her, but she has also talked about them dropping off gifts for Christmas.  B.G. has asked J.E. and Jo.G. not to show up randomly at her house or at school.  J.G. has not expressed any feelings about A.H.

6.

{¶ 17} K.W. is babied and loved by everyone in the house. B.G. sometimes carries him around. K.W. was involved with Help Me Grow until he reached age three. He has completed treatment with a pulmonologist. Mendieta described K.W. as fearless.

{¶ 18} B.G.'s 17-year-old daughter also lives in the house. She interacts with the children like a typical sibling. Sometimes she wants to play with them, sometimes she bickers with J.G., and sometimes she wants to stay in her room. B.G. has two medium sized dogs. Mendieta has no concerns with the dogs. They are not dangerous and he has not observed dog feces or urine in the home.

{¶ 19} B.G. is J.G.'s fourth home. She has had two foster homes and was placed with J.E. K.W. went to one other foster home for about four months, then moved in with B.G. the same date as J.G. The children are comfortable at B.G.'s home, they love B.G. and her daughter, and they appear to be at ease. B.G. talks to the kids, helps with homework, and cooks dinner. The children seem bonded with her and are doing well; they appear well-adjusted. Mendieta has no concerns with B.G.'s home. It is small, but it meets the children's needs.

{¶ 20} The initial goal of the case plan was reunification, but there is now an adoptive service on their case plan. The agency has not been looking for an adoptive home because B.G. has expressed an interest in adopting the children; she has completed pre-services and the adoption application and is licensed to adopt them. She has not filed a petition yet because of the ongoing case. The adoption worker is Linda Baker.

7.

{¶ 21} Mendieta has had no contact with T.B. or D.B. They have never emailed or called with inquiries. They have never asked him how they might go about completing an adoptive home study or be considered for adoption. To his knowledge, they have never had contact with the children. Before permanent custody was awarded to LCCS, the biological parents were visiting at the agency; T.B. and D.B. could have done this too. Mendieta became aware of T.B. and D.B.'s adoption petition when legal counsel provided him with the motion.

{¶ 22} T.B. and D.B.'s home study was not approved. Mendieta believes it is because of their lack of bond with the children and an issue with them being less than forthcoming during LCCS's involvement. B.G.'s is the only approved adoptive home study the agency has.

{¶ 23} Mendieta has concerns with T.B. and D.B. being permitted to adopt the children. K.W. does not know them; B.G.'s home is the only home he has known and it would be traumatic to remove him. J.G. does not have an active relationship with them and has never mentioned them. His recommendation is that B.G. be permitted to adopt the children. LCCS does not like moving children, especially after they have had multiple moves and are in a home where they are safe, are getting their needs met, and are someplace that may be a permanent solution.

{¶ 24} Mendieta has never told J.G. that her great-grandparents are interested in adopting them and has never asked her what she thought of them. J.G. has some trust issues because her mother and grandmother have made promises that did not come true,

8.

so he would not want to get her anxious or raise her hopes until he knew for certain what the plan was. T.B. and D.B. have not yet come back into their lives, so he does not know how J.G. would feel or react.

### 3. D.B.

{¶ 25} D.B. testified that she is the children's great-grandmother. She last saw K.W. three years ago, when he was in the hospital after he was born. She does not know the last time she saw J.G. The kids live with B.G., who is a distant cousin. D.B. has never visited the children at B.G.'s home. She called B.G. once to ask if she could bring Christmas presents for the kids, but B.G. would not allow it. She has not spoken to anyone from LCCS to try to obtain visitation or contact with the kids, nor did she contact LCCS to arrange to get gifts to the children—she said she did not know that she could do that.

{¶ 26} D.B. says that B.G. is not "[her] kind of person." She describes B.G. as "too flighty" and "hormonal." She maintains that J.G. never met B.G. before being placed in her care. D.B. believes that B.G. has excluded her and her husband from the children's lives. She has never seen B.G. interact with the kids. She has never witnessed interactions between B.G., J.E., and Jo.E.

{¶ 27} D.B. never contacted LCCS herself to get a home study; J.E. contacted the home study assessor. D.B. first stated that she did not interpret the home study as concluding that she was not recommended to adopt the children, but ultimately acknowledged that the home study "was denied," which she attributed to her age. She

9.

did not contact anyone at LCCS after learning the results of the home study. D.B. conceded that J.E. and Jo.G. have contributed toward the costs associated with trying to obtain custody of the children. The GAL never contacted her or inspected her home.

{¶ 28} D.B. maintains that she and T.B. love their great-grandchildren and want them in their home. She believes that she and T.B. can provide them with a loving, nurturing home and it is in their best interest to be with their great-grandparents. She describes herself as a young 63 with no significant health problems, and she insists that she is physically able to raise a young child. She is confident that if the children adapted to B.G.'s home, they will be able to adapt to her home.

{¶ 29} D.B. testified that J.E., who is her daughter and the children's grandmother, visits her home a few times a week. Jo.G., the children's mother, comes for holidays and visits occasionally. D.B. said that she did not know if she would allow J.E. and Jo.G. to have contact with the children if her petition for adoption is granted. She supposed that "in the beginning," she would not. She would want the children to become settled and relaxed in her home before she would allow contact with them, but after they were settled, she would probably allow J.E. and Jo.G. to see them "if things were permitted." She denied that if allowed to adopt the children, she intends to return them to Jo.G.

{¶ 30} D.B. acknowledged that her 90-year old mother-in-law lived with her and her husband for about five-and-a-half months, beginning in May of 2019. She was bedridden and required a lot of care. They placed her in a nursing facility for respite care that was initially supposed to last two weeks. It ultimately lasted four weeks and her

10.

mother-in-law did not return to their home. Instead, she went to live with her daughter. D.B. explained that this decision was made so that her mother-in-law could spend time with her daughter, who was unable to visit her at T.B. and D.B.'s home because of lack of transportation.

{¶ 31} D.B. said that she attended a staffing at Toledo Hospital after K.W. was born. She acknowledged talking on the phone with LCCS caseworker, Danielle Stroble; she said that Stroble hung up on her. D.B. denied that LCCS informed her of any restrictions with respect to babysitting J.G., and she denies violating any LCCS restrictions. She did not think it would hurt anything to let T.B. babysit J.G. because he is her great-grandfather.

### 4. B.G.

{¶ 32} J.G. and K.W. have been in B.G.'s home since August 5, 2016. Jo.G. is the one who asked her if the children could stay with her. They were in foster care with LCCS and they were looking for somebody in the family that they could be with. The process started in May of 2016. B.G. submitted her fingerprints. A home study was performed and was approved.

{¶ 33} K.W. is three and very bubbly. He talks a lot and is full of life. When he came to her, he had been diagnosed with asthma, hypothyroidism, and laryngomalacia—a hole in the esophagus. He sees a pulmonologist, an endocrinologist, and his family physician. He was involved with Help Me Grow until he was three and now he is in Head Start. He had to wear special pants to keep his legs together when he first started

11.

walking, and he wore special shoes. He had speech therapy, but his speech has improved. He sees his doctors approximately every three months.

{¶ 34} J.G. is bubbly and princess-like. She loves attention, loves to learn new things, is interested in math and science, and reads at a fourth-grade level even though she is in the second grade. School is going well for her. J.G. has taken art classes at the museum. Next year she may start soccer or basketball.

{¶ 35} J.G. and K.W. get along like normal siblings. They like to go to the park and the library, and they like to take walks. B.G. also has a 17-year-old daughter, H.G. J.G. and H.G. get along like sisters would—sometimes they get along; sometimes they don't.

{¶ 36} B.G. is willing to adopt the children. She has gone through the adoptive home study process and was approved. She lives in a three-bedroom house, but it has sufficient room for the children. She has two medium-sized dogs. They are loud but gentle and they love the kids. There have been no negative interactions between the kids and the dogs.

{¶ 37} In September, J.E. and Jo.G. came to give the kids some clothes. Jo.G. said she was doing better and was in rehab. B.G. wanted to see some records from rehab or speak with the counselor to verify that Jo.G. was doing better, but this never happened. They came a few times and wanted to see the kids on Halloween of 2018. There was a bad interaction at J.G.'s school. Jo.G. was "bouncing around" and the police had to get involved to escort J.G.'s bus home. The police believed Jo.G. was under the influence

12.

and may have wanted to take J.G. The principal called her and wanted to talk to her about the situation and the police spoke with her. Because of this, B.G. ended up not spending Halloween with J.E. and Jo.G.; instead she took the kids trick-or-treating with a friend. After that, B.G. stopped answering Jo.G.'s phone calls. She is not aware of any criminal charges being filed against Jo.G. in connection with this incident.

{¶ 38} B.G. knows T.B. and D.B.—T.B. is her cousin. D.B. called her around last November to ask if the children could come for Thanksgiving or Christmas. B.G. did not allow it because she was concerned that D.B. was going to let Jo.G. take them. She had no further interaction with T.B. and D.B. after this. B.G. has always gotten along with T.B. and D.B. They are polite, friendly, clean, set a good example, and she has no reason to believe that they would be bad adoptive parents.

{¶ 39} When Jo.G. still had visitation rights, B.G. spoke with her a lot. She would call periodically to speak with the kids and wanted to come to see them as much as possible. But LCCS did not want J.E. and Jo.G. to see the kids outside of visitation, so she tried to keep them at bay and allow only telephone contact. Jo.G. would call about twice a week, then might not call again for six or eight weeks. Since the agency obtained permanent custody, Jo.G. would pop in demanding to see them. She behaved volatilely. The interaction with J.E. was similar. It would go really well or really badly. She no longer has phone communications with them because if J.E. or Jo.G. disagreed with her, it would end up in a fight.

13.

{¶ 40} A.H. stopped by three or four times and would sit outside on the porch with her and visit with J.G. She stopped coming around when she got pregnant. Usually those visits were okay, but the last time she was there, she showed up with a car full of men. It was dark out and B.G. did not know A.H. was coming, so she did not answer the door. A man got out of the car and started beating on the door.

{¶ 41} J.E. and Jo.G. have given the kids gifts. T.B. and D.B. never have, and they have not seen the kids since they have been in B.G.'s care. If they were to see the kids, B.G. thinks it should be monitored because she is concerned they will hand the kids over to Jo.G. and J.E. because "[she has] heard them all say it." Jo.G. told her at one time that she knew a woman who was planning to adopt the children she was caring for and return them to their biological mother. Jo.G. wanted B.G. to do this for her. B.G. does not know if T.B. and D.B. would go along with Jo.G.'s desire to return the children to her.

{¶ 42} B.G. wants to adopt the kids because they are like her babies. She thinks it is in their best interest. It is concerning to her that T.B. and D.B. do not know the children. J.G. never speaks of them. She showed J.G. a picture of them and she didn't know who they were. J.G. misses Jo.G. but has expressed that she is scared sometimes and not trusting when she is with her. She mentions J.E. once in a while. She does not mention A.H.

{¶ 43} N.H. has dropped off gifts for the kids before from J.E., Jo.G., and A.H. B.G. did not have a problem with A.H. visiting until it got "nasty," then she just stopped

14.

communicating with A.H. B.G. blocked her phone calls in October of 2018, after she swore at her and made demands. She thinks monitored visits with A.H. would be appropriate. B.G. believes A.H. is a bad influence on the kids. She thinks A.H. parties, drinks, and does drugs. She also believes that A.H. has sung vulgar raps songs to the children and taught them gang signs. She demonstrated some of the hand gestures she has seen them make but does not know what the signs mean. She and A.H. fought because B.G. would not let her take the kids with her.

{¶ 44} Around a month or two ago, while driving, B.G. saw A.H.'s car in Rossford. She (or perhaps someone else in her vehicle) followed B.G., passed her, then turned around and came at her head-on. B.G. called the police, then followed A.H. onto I-75 to get her license plate number. She does not think that A.H. was coming to see the children because it was around noon on a weekday, when J.G. was in school.

{¶ 45} B.G. volunteers at Maumee Valley Save-a-Pet. She used to work at Northwood Club Pet Resort. She was employed there for six months. She does some painting work. The last time she had a full-time job was when the kids came to live with her. She stopped working at that point and her ex-boyfriend helped support her. They broke up in October of 2017.

{¶ 46} B.G. gets child support of $500 for H.G., until next year when she turns 18, and she gets support for the other children. The state pays for K.W.'s health care. She receives no compensation for taking him to appointments. She denied that she has an economic interest in keeping the kids. At first she received no income for the kids, but

15.

this changed around the end of the summer of 2019.  Since signing the adoption papers, she gets a subsidy of $700.  Before the $700 subsidy, she received $400 from Ohio workforce.  She would still be willing to adopt even without the subsidy.

{¶ 47} B.G. believes H.G., J.G., and K.W. are well-adjusted.  She agrees that it is a healthy thing for kids to maintain a relationship with grandparents and aunts and uncles and it would be a good thing for the kids to have a relationship with their sister.

### 5.  Linda Baker

{¶ 48} Linda Baker is employed by LCCS as an adoption caseworker.  When LCCS decides to pursue permanent custody, there is an adoption referral made.  She monitors the case until there's a permanent custody decision and then she works with the prospective adoptive family towards finalization by monitoring the adjustment of the child and the family in the home.  She was assigned to J.G. and K.W.'s case in May of 2017.

{¶ 49} After permanent custody is granted to the agency, Baker is in contact with the family every other month until an adoptive placement agreement is signed, then monthly.  Barker has been to B.G.'s home and has observed the children.  B.G. lives in the Rossford school district.  Her home is small but adequate, with a large side yard.  The children are well-adjusted and Barker has no concerns about their interactions.  B.G. is loving, nurturing, and patient.  The children have food and shelter and J.G. is in school.  J.G. likes school and is healthy.  K.W. had some issues early on but seems healthy now.

16.

{¶ 50} Barker has no concerns about B.G.'s dogs. B.G. is willing to adopt and the agency has consented. There was a home study and a pre-finalization assessment report approving B.G.'s home.

{¶ 51} The agency holds a matching conference, mandated by the state, where it looks at the home study of families interested in adopting. There is also a child characteristic check that goes along with it that takes into account the children's behavior, any special needs, ages, number of children, whether there has been juvenile court involvement, whether psychiatric services are needed, the children's level of bonding, school services, continuity of care, and whether siblings would stay together. A matching conference took place here.

{¶ 52} Barker has had no contact with T.B. and D.B. They never contacted her for a home study. She did not know who they were until the adoption petition was filed. She did not receive an approved home study for them. T.B. and D.B. were not evaluated because she did not know about them.

{¶ 53} B.G.'s is the only home Barker has investigated or examined. Because Barker does not know T.B. or D.B., she cannot comment on whether they would be good adoptive parents. She does not know A.H. and has no opinion whether it would be good for her to have regular contact with J.G. and K.W.

{¶ 54} J.G. has expressed excitement at being adopted by B.G. She wants certainty as to where she is going to be and she is happy where she is. Barker has not

17.

discussed with her whether she would be happier if she were adopted by her great-grandparents.

## 6. Mary Clark

{¶ 55} Clark was appointed as the children's GAL. She has completed an investigation. She does monthly home visits, some announced, some unannounced. She plays with the children when she visits. B.G.'s home has three bedrooms. She has two dogs, but they are usually outside or behind a gate when Clark comes because Clark has allergies.

{¶ 56} K.W. was born positive for methadone and had withdrawal in the beginning. B.G. has met all of his medical, social, and emotional needs. J.G. did not have much structure when she was living with her grandmother. She had more structure at her first foster home and adjusted well, but she still experienced trauma. J.G. transitioned nicely into B.G.'s home. B.G. is very loving and open with communication. When J.G. was seeing her mother at the agency, it was chaotic for her. Visitation had to be terminated because it was not in J.G.'s best interest.

{¶ 57} J.G. is very talkative. K.W. is also talkative but sometimes difficult to understand. Clark talks with J.G. about school, her friends, her favorite colors, and dancing. J.G. always has things to show her and talk to her about. She loves reading and reads at a fourth-grade level. She likes art. Clark told B.G. about scholarships for programs at the art museum. J.G. participated and loved it. J.G. says she wants B.G. to adopt her. She does not talk about her mom much. Living with her mom scared J.G.

18.

because Jo.E. and M.W. fought. She does not talk about J.E. or her great-grandparents and it has been a very long time since she has talked about A.H.

{¶ 58} Clark was present during the permanent custody trial. Her opinion at the permanent custody hearing was that LCCS should be awarded permanent custody of the children. She saw T.B. and D.B. at the permanent custody hearing but does not know them and has had no contact with them. They did not seek custody in the permanent custody case. They have not contacted her. She knows about their history with the agency and the lack of trust. She knows Jo.G. really wants to get the kids back and B.G. has been good at saving the children from that drama. She is not sure T.B. and D.B. could do this.

{¶ 59} Clark recommends that B.G. be permitted to adopt the children. B.G. is a relative who was recommended by Jo.G. in the first place, J.G. has been with B.G. half her life, and K.W. has been there all his life. They are bonded with B.G., there is structure, they are loved, they are part of the family, and their needs are being met. While she is certain that T.B. and D.B. are a nice family and want what is best for the children, Clark sees no reason for J.G. and K.W.'s situation to be disrupted. She believes it is in their best interest that they remain with B.G.

{¶ 60} There was no reason to independently investigate T.B. and D.B., especially after Clark saw the home study. She agrees that the home study was not approved because of the lack of a prior relationship. Since she has been involved with the children, she has not heard of them having a relationship. She has done no comparative analysis

19.

between B.G. and T.B. and D.B. and she sees no reason to do one. She believes it would be traumatic and detrimental to disrupt the bond the children currently have with B.G. They are thriving where they are.

{¶ 61} Clark at one point was A.H.'s GAL. Initially A.H. tried to stay above the drama of the family, but she ultimately dropped out of twelfth grade, got pregnant, and now has two children. Clark thinks it has been hard for her to be a functioning adult because there were a lot of countervailing forces. After A.H. became emancipated, Clark no longer had contact with her. Clark trusts B.G., so she trusts when B.G. expresses concerns about A.H.'s influence. Generally speaking, Clark believes it is good for minor siblings to maintain regular contact with their older siblings if the older sibling is appropriate. She trusts that B.G. will someday allow A.H. to come back into their lives.

### 7. J.E.

{¶ 62} J.E. is the maternal grandmother of J.G. and K.W. She is the daughter of T.B. and D.B. She testified that when LCCS obtained custody of J.G., she was initially allowed visitation at the agency. She would generally be there with her daughter, Jo.G., and her granddaughter, A.H., J.G.'s older sister. She approximates that she visited with the kids four to five times. She testified that the second to last time she visited, she noticed a creamy discharge in J.G.'s underwear, which she reported to caseworker Christina Disilvis. About a month later when she visited with J.G., J.G. told her that her "pee pee hurts." The left lip of her vagina appeared to have "a little burn" and there was "a really bad discharge." She reported this to a number of people, including "the mayor,

20.

the commissioner, the FBI, * * * even the sister at Rosary Cathedral." She also spoke with Robin Reese, an LCCS ombudsman. She claims that no action was taken, but on cross-examination she acknowledged that Disilvis told her that her allegation of sexual abuse was determined to be unfounded.

{¶ 63} J.E. claims that after making these complaints, she was no longer able to see J.G. J.G. was living with B.G. at this time. She claimed that her relationship with B.G. was good until she made this report. After that, B.G. denied access to J.G.

{¶ 64} Before LCCS obtained custody of J.G., J.G. had a good relationship with her great-grandparents. They saw each other at least every couple of weeks, but maybe two to three times a week during the summer because they went swimming there. She also spent the holidays with her great-grandparents. She said J.G.'s great-grandparents were important to J.G. and she was close to them. Several family photos were shown to J.E. and she identified them.

{¶ 65} The last time J.E. saw J.G. was October 30, 2018. B.G. allowed J.E. and Jo.G. to see the children for Halloween. She let them give the kids candy and costumes and take them trick-or-treating. She said K.W. hugged Jo.G. and wrapped his arms and legs around her.

### 8. A.H.

{¶ 66} A.H. is the great-granddaughter of T.B. and D.B. She is the sister of J.G. and K.W. She is 20 years old. She has two children, both of whom have the same father. She was emancipated at age 17 and left school her senior year. She plans to get her GED,

21.

then she wants to go to beauty school and become an aesthetician. A.H. is employed. When she works, her children are watched by their father. He sometimes works installing furnaces. She has a car and makes the car payments.

{¶ 67} Before she was emancipated, A.H. lived with her grandmother, J.E. She spent holidays at T.B. and D.B.'s home, was very close with them, and would see them a few times a week. Her great-grandparents are important to her and have always taken an interest in her. This is also true for J.G.

{¶ 68} J.G. was three years old when she was taken from her home. J.G. was like a daughter to A.H. She last saw her a year ago. B.G. will not let J.G. see her or talk to her on the phone. B.G. changed her phone number. Before last year, B.G. would let her come by to visit one or two times a week and would let her call. A.H. noticed a sudden change in B.G.'s attitude. B.G. eventually said it was getting to be too much for her. She denied that she went to B.G.'s home with a bunch of guys in her car. She did not teach J.G. gang signs or teach her any songs with offensive lyrics.

{¶ 69} Three to five months ago, B.G. followed A.H. in her car and it scared her. She went the wrong way down a one-way street to avoid a confrontation with her. B.G. took her phone out and recorded A.H. B.G. then followed her down the expressway. The Rossford police never called to question her. She never tried to smash B.G.'s car.

{¶ 70} A.H. met B.G. for the first time when she was about 16, then again when B.G. came to get J.G. from LCCS. She had no prior relationship with B.G.

22.

{¶ 71} A.H. got to meet K.W. but never got to build a relationship with him. She has not been able to see him since he has learned to walk and talk. It makes her emotional and depressed and she feels a loss not being able to see her brother and sister. J.G. would always be excited to see her.

{¶ 72} A.H. denies that she uses drugs or alcohol. When she is not at home with her kids, she goes on dates with their dad. She would like to be a part of her siblings' lives again.

{¶ 73} A.H. acknowledged that she was charged with a safe school assault, disorderly conduct, resisting arrest, and obstruction of official business. She was sentenced to jail time, suspended on the condition of probation. She has a theft conviction for stealing merchandise at Macy's. Her last arrest was approximately a year ago. She denies that she has a bad temper or that she is a bad influence on J.G. She has never lost her temper with B.G., J.G., or K.W.

### 9. N.H.

{¶ 74} N.H. is a friend of T.B. and D.B.'s family. He and J.E. went to B.G.'s home several times to visit the kids. The first time, it was very cordial. J.E. and B.G. smoked a cigarette in the backyard while the kids played. The next time, a few weeks later, things were tense. B.G. went outside while J.E. visited with the kids. N.H. went back a couple more times to deliver gifts for the children. He chatted with B.G. while the kids opened their gifts. He described that B.G.'s house was in "pretty decent order," but the odor of her three dogs bothered him.

23.

{¶ 75} N.H. has known B.G. for a long time.  Her ex-husband was one of N.H.'s students.  The last time he saw B.G. was the Christmas before last.  He went with J.E. and Jo.G to deliver presents.  J.E. knocked, but nobody answered.  After they left, they were pulled over by two Rossford police officers who said that they had been notified that they were at the property and there was an order prohibiting them from being there.  The officers contacted B.G. and B.G. agreed to allow N.H. to drop off the gifts.  He left them on the porch because no one answered the door when he knocked.

{¶ 76} N.H. often had contact with J.G. before she was placed with B.G.  He has observed J.G. with her great-grandparents at holidays.  J.G. would run up and give her great-grandparents hugs.

### 10.  N.M.

{¶ 77} N.M. is the grandson of T.B. and D.B., the son of J.E., the brother of Jo.G., and the children's uncle.  He lives with J.E.  He spent a lot of time with A.H. and J.G. when they were growing up because they lived on the same street.  He would see J.G. almost daily.  J.G. spent "a pretty good amount" of time with her great-grandparents. They would go to their home for holidays and family gatherings.

{¶ 78} N.M. described T.B. as a good, respectful man.  He and his grandfather enjoyed outdoors activities together, like fishing, and T.B. would help N.M. with school projects.  D.B. is a good cook.  She loves the kids and is very motherly toward them. T.B. and D.B. have a big yard; J.G. liked to play and run around in the yard.

24.

### 11. F.G.

{¶ 79} F.G. is the great-granddaughter of T.B. and D.B. Before J.G. was placed in foster care, she saw her twice a week. F.G. goes to T.B. and D.B.'s home approximately twice a week. She described it as very calm and family-oriented. Her great-grandparents are dependable and were a big part of J.G.'s life. J.G. was always excited to see them and she would run to them. F.G. has never met K.W.

### 12. C.B.

{¶ 80} C.B. is the son of T.B. and the stepson of D.B. He described his father as an outdoorsman who is good with kids. C.B. lived with T.B. and D.B. after separating from his girlfriend, so he would see J.G. when Jo.G. brought her over. He said that D.B. has been very good to him and he loves her. She is patient with her grandchildren and makes cookies for them. It has been approximately 15 years since T.B. and D.B. have cared for a child under the age of ten. T.B. had his rotator cuff repaired so he does not fish much lately. He was hospitalized within the last three years for a respiratory issue. C.B.'s grandmother lived with T.B. and D.B. for a couple of months and nurses came to the home to assist in her care. C.B. has a couple of theft convictions and convictions for driving under suspension.

### 13. C.R.

{¶ 81} C.R. is D.B.'s first cousin. She spends time at T.B. and D.B.'s home for holidays and cookouts and sees them at funerals and other family gatherings. She has seen J.G. at T.B. and D.B.'s home. J.G. was close with T.B. and D.B. and loves them.

25.

They are good with kids and are physically able to take care of them despite their age. T.B. has had surgeries in the past but no "health issues." C.R. has not seen J.G. in three years. She described B.G. as "not right," but she conceded that she has never met her or been to her home.

### 14. T.B.

{¶ 82} T.B. testified that he and D.B. are retired. They have been married for 43 years and have one child together. He has three children from a previous marriage.

{¶ 83} T.B. testified that he is under no physical limitations that would impair his ability to raise young children. He described himself as active. He hunts, fishes, and cares for his three-acre yard. He looks forward to having young children around and said that they keep him young. He wants to teach J.G. how to raise livestock.

{¶ 84} T.B. does not like B.G.; he believes she is flighty and "her morals aren't exactly up to [his] standards." He believes she behaves in a sexually provocative way. He never contacted LCCS about the concerns he had with B.G. and he never filed charges.

{¶ 85} T.B. disagrees that it would be too traumatic to remove the children from B.G.'s care. He and his wife have always been close with J.G. and the children should be with their maternal family. They always had fun together and she was always active with them. J.G. came from "a family with drugs," so he imagines that the transition to B.G.'s home was positive, but he believes it would be easier for her to transition to being in their home. He is certain she will remember them.

26.

{¶ 86} T.B. denied that their petition for adoption is just a sham to give the children back to their mother. He claims that he would not let anyone—including his own children—be around the children if they were on drugs or not in their right mind. He and D.B. are able to take care of the children financially.

{¶ 87} Jo.G. and J.E. have helped pay the costs associated with petitioning to adopt the children, but T.B. stated that the entire family has contributed to the costs. He said they could afford to pay themselves but it made the family feel good to help.

{¶ 88} Two years ago, T.B. had rotator cuff surgery. His mother lived with them for five or six months. They paid for most things for his mother until "social security kicked in," but she also had aides. It has been 15 years since he and D.B. cared for children under the age of 10 for an extended period of time. He let D.B. handle speaking with LCCS about the home study, but insisted that he would not rely on her to provide care for the children. He never contacted LCCS to arrange to visit with the children.

## B. The Trial Court Judgment

{¶ 89} In judgments journalized on January 6, 2020, the trial court denied T.B. and D.B.'s petitions for adoption. It found that the evidence was uncontroverted that the children are currently in a stable family relationship and have adjusted well to their current home, school, and community. It observed that J.G. experienced negativity while with her birth parents and the juvenile court acknowledged this negativity by terminating parental rights. The court noted that J.G. has had four placements, none of which were with T.B. and D.B., and has expressed a desire to be adopted by her current caregiver. It

27.

recognized that the GAL recommends that the children remain together in their current placement and expressed concerns that a new placement could very likely be problematic. The court was persuaded that the agency has "real and significant" concerns that if the petition for adoption is granted, the children will have contact with their birth parents.

{¶ 90} T.B. and D.B. appealed the trial court judgments and assign the following errors for our review:

I. IT CONSTITUTED ERROR FOR THE PROBATE COURT TO FIND APPELLANTS DID NOT HAVE "AN APPROVED HOME STUDY ASSESSMENT."

II. IT CONSTITUTED ERROR TO FIND THAT LCCS WAS NOT UNREASONABLY WITHHOLDING CONSENT TO APPELLANTS' PETITIONS FOR ADOPTION.

III. IT CONSTITUTED ERROR NOT TO BIFURCATE THE PROCEEDINGS.

## II. Law and Analysis

{¶ 91} In their first assignment of error, T.B. and D.B. argue that the trial court erred when it found that they did not have an approved home study assessment under R.C. 3107.031. In their second assignment of error, they argue that the trial court erred when it concluded that LCCS did not unreasonably withhold its consent to adoption under R.C. 3107.07(H). And in their third assignment of error, they argue that the court erred in failing to bifurcate the hearing on the issues of (1) whether the agency

28.

unreasonably withheld its consent to adoption, and (2) whether adoption of the children by T.B. and D.B. would be in the children's best interest under R.C. 3107.161. We address each of these assignments in turn.

### A. The Home Study

{¶ 92} In their first assignment of error, T.B. and D.B. argue that it was contrary to law for the probate court to find that they did not have an approved home study assessment. They maintain that the section of the home study assessment entitled "Disposition of Adoption Parties" is left blank and, therefore, does not express one of the permissible recommendations required under Ohio Admn. Code 5101:2-48-12(T).

{¶ 93} R.C. 3107.031 requires that a home study be conducted "for the purpose of ascertaining whether a person seeking to adopt a minor is suitable to adopt." A written report of the home study must be filed with the court stating "the opinion of the assessor as to whether the person who is the subject of the report is suitable to adopt a minor." R.C. 3107.031. Under Ohio Admn. Code 5101:2-48-12(T), "[t]he assessor shall make one or more of the following recommendations at the completion of the adoption homestudy: (1) [a]pprove the applicant(s) as adoptive parent(s)[;] (2) [a]pprove the applicant(s) as adoptive parents and recommend the applicant(s) for certification as a foster caregiver(s) simultaneously[;] (3) [d]eny the adoption application."

{¶ 94} T.B. and D.B. are correct that the disposition section of the home study assessment is left blank. But as they acknowledge, in the section of the assessment

entitled "Family Strengths and Needs," the assessor provided a narrative, stating that she is not recommending an adoptive placement with T.B. and D.B. She explained:

> I am not recommending an adoptive placement with this family at this time. [T.B. and D.B.] are good people who have reared their children and were involved with grandchildren. I believe they want [J.G. and K.W.] to be reared with family and are making this gesture out of love.
>
> However, they do not have any direct experience with these children. I am uncomfortable placing them permanently if they have not had a chance to develop a relationship and see if they are up to the demands of two young children. In other situations like this, the family has had, at the least, supervised visitations at LCCS and have an established relationship with the children. It is unclear why [T.B. and D.B.] have not had this opportunity. They told me they were denied by LCCS.
>
> During my three month involvement with [T.B. and D.B.], it has appeared stressful for them to complete the homestudy process. Communication with them was difficult and it appeared that caring for [T.B.]'s mother was an additional stressor. They also indicated that their children's support would be limited because they would not visit in the inclement weather. I also have questions about their health and stamina and believe it was difficult for them to be open with me about issues that could impact their parenting.

{¶ 95} T.B. and D.B. maintain that the home study assessment did not conclude that their home was unsuitable; rather it "essentially described [their] personal characteristics and their home in more-or-less glowing terms." It also described that T.B. and D.B. met the applicable criteria for maturity, responsibility, financial capability, and love of the children. Nevertheless, "out of the blue," the assessor declined to recommend them as an adoptive placement based on their lack of direct experience with the children and the absence of an opportunity to "develop a relationship and see if they are up to the demands of two young children." They counter that it is untrue that they have had no direct experience with the children, and they emphasize that while K.W. was taken from his biological mother shortly after birth, J.G. spent every major holiday with them until being placed with B.G.

{¶ 96} Regardless of whether T.B. and D.B. agree with the assessor's conclusions, their first assignment claims error in the trial court's conclusion that they lack an approved home study. They argue that this conclusion was contrary to law given that "the report itself fails to conform to the requirements of law." We must disagree. It may have been preferable for the assessor to have completed the section of the form entitled "Disposition of Adoption Application" and to have checked one of the two boxes provided: (1) adoption application denied; or (2) adoption application approved. But the assessment makes clear that the assessor recommended that T.B. and D.B. not be approved for adoptive placement. As such, the assessment included one of the recommendations required under Ohio Admn. Code 5101:2-48-12(T).

31.

{¶ 97} We, therefore, find T.B. and D.B.'s first assignment of error not well-taken.

## B. Withholding of Consent

{¶ 98} Generally speaking, an agency that has permanent custody of a minor must consent in writing to the adoption of the minor before a petition to adopt may be granted. R.C. 3107.06(D). But under R.C. 3107.07(H), consent to an adoption is not required of "[a]ny legal guardian or lawful custodian of the person to be adopted, other than a parent, who * * *, after examination of the written reasons for withholding consent, is found by the court to be withholding consent unreasonably." In their second assignment of error, T.B. and D.B. argue that the trial court erred in concluding that LCCS did not unreasonably withhold its consent to their petition for adoption.

{¶ 99} In order to dispense with the consent requirement, it must be shown by clear and convincing evidence that the agency unreasonably withheld its consent to the adoption. *In re Adoption of I.C.,* 6th Dist. Lucas No. L-10-1157, 2011-Ohio-1145, ¶ 32, citing *Matter of Jeffrey A.,* 6th Dist. No. L-08-1006, 2008–Ohio–5135, ¶ 9. "Clear and convincing evidence" is "'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *Id.,* quoting *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). It is an intermediate burden of proof—more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *Id.*

{¶ 100} "[A]n adoption proceeding is a two-step process involving a 'consent' phase and a 'best-interest' phase." (Internal citation omitted.) *In re Jeffrey A.* at ¶ 4. If

32.

"the court finds that the required consents have been obtained or excused and that the adoption is in the best interest of the person sought to be adopted as supported by the evidence, it may issue * * * a final decree of adoption or an interlocutory order of adoption * * *." R.C. 3107.14(C). We review a trial court's determination of the reasonableness of the agency's withholding of consent under an abuse-of-discretion standard. *In the Matter of Adoption of Shortridge,* 4th Dist. Pike No. 387, 1985 WL 9478, *4 (May 30, 1985) ("[W]e believe the proper focus is upon whether the court below, in determining the withholding of consent to adoption was reasonable, abused its discretion."). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 10th Dist. Franklin No. 17AP-742, 2019-Ohio-223, ¶ 13.

{¶ 101} Here, the court found that LCCS did not unreasonably withhold consent to T.B. and D.B.'s petition for adoption. It reasoned that (1) J.G. has had four placements and a fifth placement would likely be problematic for her; (2) the children are currently in a stable family relationship and are well-adjusted to their home and community; (3) J.G. is well-adjusted to school; (4) J.G. is of the age that she has expressed a desire to be adopted by her current caregiver and has expressed that she experienced negativity while with her birth parents; (5) there is a "real and significant" concern that the children would once again have contact with their birth parents if T.B. and D.B. are allowed to adopt; and (6) the GAL recommends that the children remain together in their current placement. *Compare In re Jeffrey A.* at ¶ 11 (finding that LCCS unreasonably withheld

consent when it relied on only one factor—that petitioners were not blood relatives of the children—and ignored numerous other factors, including the children's relationship with the petitioners, the nurturing home environment, the relationships between the children and petitioners' biological children, and the developmental progress the children achieved under petitioners' primary care). While the court acknowledged that T.B. and D.B. are genuinely concerned with the children's best interests, it found that those interests would be best served by the children remaining in their current placement.

{¶ 102} Having reviewed the record in its entirety, including the transcripts from the two-day hearing, we conclude that it was not shown by clear and convincing evidence that the agency unreasonably withheld its consent to the adoption. We find that the trial court's decision is supported by sound reasoning, and it did not abuse its discretion in concluding that LCCS did not unreasonably withhold its consent.

{¶ 103} Accordingly, we find T.B. and D.B.'s second assignment of error not well-taken.

### C. Bifurcation

{¶ 104} In their third assignment of error, T.B. and D.B. argue that the trial court erred in failing to bifurcate the proceedings with respect to the issues of consent and the best interest of the children. They maintain that the trial court began the hearing by announcing that the November 25, 2019 hearing would be dedicated to the issue of whether LCCS unreasonably withheld its consent to adoption, but the court nevertheless went on to deny their adoption petition, concluding that a new placement would not be in

34.

the children's best interest.  They insist that this was error because they were denied the opportunity to be heard on the issue of the children's best interests.

{¶ 105} Before the hearing began, the trial court announced its intent to limit the hearing to the issue of consent and to hold a second hearing on the issue of the children's best interest, perhaps with an agreement by the parties that certain evidence presented in the first hearing may be stipulated to in the second hearing.  It recognized the difficulty in separating the two issues, particularly given that LCCS had withheld its consent *because* it felt that adoption by T.B. and D.B. would not be in J.G. and K.W.'s best interest.  But the court led the parties to believe that a second hearing would take place:

> The court discussed with counsel in chambers the difficulty in this kind of case of separating the consent – reasonableness of withholding consent issue from the actual best interest hearing which is, those factors are found in Section 3107.161 and very difficult to bifurcate these hearings because I guess obviously the agency has failed to consent to these petitions because the agency feels they are – it's not in the best interest of the children so it's very difficult to bifurcate those.

> However, we are proceeding today to hearing on the issue of whether the agency is unreasonably withholding its consent and then based up the outcome of this hearing, the court will make a determination as to whether or not the court can make a determination whether the parties could possibly agree as to whether or not any of the evidence obtained at

35.

this hearing could be stipulated to for further hearing if necessary regarding the best interest.

{¶ 106} As we observed above, "'an adoption proceeding is a two-step process involving a "consent" phase and a "best-interest" phase.'" *In re Jeffrey A.,* 6th Dist. Lucas No. L-08-1006, 2008-Ohio-5135, at ¶ 4, quoting *In re Adoption of Jordan*, 72 Ohio App.3d 638, 645, 595 N.E.2d 963 (12th Dist.1991). The consent and best-interests portions of the proceedings may be considered in one hearing. *In re Adoption of Walters*, 112 Ohio St.3d 315, 2007-Ohio-7, 859 N.E.2d 545, ¶ 21 ("One hearing to address both requirements is sufficient."). Conversely, a court may hold separate hearings for the consent and best-interests portions of an adoption proceeding. *Id.*

{¶ 107} Despite stating that the issues of consent and best interest would be bifurcated, the trial court concluded in its judgment entries that it would be in the children's best interest to remain in their current placement and it denied T.B. and D.B.'s petition without engaging in further proceedings:

> In consideration of these factors, all other factors contained in ORC 3107.161, and in consideration of the least detrimental available alternative, this court is unable to find that the agency is unreasonably withholding its consent from this petition. This court agrees with the assessment of the guardian ad litem that the child[ren] should remain in [their] current placement.

36.

Accordingly, this court hereby finds that the agency is not unreasonably withholding its consent from this petition and therefore the petition is hereby denied and dismissed.

{¶ 108} The trial court essentially concluded that *because* it is in the children's best interest to remain in their current placement, LCCS did not withhold its consent unreasonably. And *because* LCCS did not withhold its consent unreasonably, T.B. and D.B.'s petition must be denied. This is not the proper analysis. "The reasons for the refusal to consent are simply *part* of the evidence weighed by the court." (Emphasis added.) *Matter of Adoption of Crabtree*, 4th Dist. Jackson No. 482, 1984 WL 5626, *2 (Aug. 31, 1984). Even where the refusal of the agency is not unreasonable, it is still within the final authority of the probate court whether to grant or deny the adoption petition based on its own independent analysis of the best interests of the child. *In re Haun*, 31 Ohio App.2d 63, 68, 286 N.E.2d 478, 481 (8th Dist.1972). *See also In re Dickhaus,* 41 Ohio Misc. 1, 5, 321 N.E.2d 800, 803 (C.P.1974) ("Where substantial reasons exist for withholding the answer and consent, and the court is satisfied that it is not in the best interest of the child to require it, the petition for adoption will be denied.").

{¶ 109} Frankly, it is difficult to imagine what additional evidence T.B. and D.B. could put forward in a separate hearing on the issue of best interest. It presented nine witnesses who testified to the couple's love for the children, the closeness the couple once had with J.G., the couple's ability to care for the children, B.G.'s role in alienating the couple from their great-grandchildren, the couple's intentions with respect to allowing

37.

contact between the children and their biological mother and grandmother, among various other issues.

{¶ 110} It is also difficult to understand why the trial court would purport to bifurcate hearings on issues that, under the circumstances, were so inextricably intertwined. But this is the procedure the court told the parties it planned to employ. The Ohio Supreme Court held in *In re Adoption of Walters*, 112 Ohio St.3d 315, 2007-Ohio-7, 859 N.E.2d 545, ¶ 10, that "R.C. 3107.11(A) does not require the notice of a hearing on an adoption petition to include language that both the consent and best-interests requirements will be addressed at the hearing." But where the court *expressly* advises the parties that it intends to bifurcate hearings on these issues, we believe the parties should be able to rely on the court's explanation of how the proceedings will be conducted so they can prepare accordingly.

We, therefore, find T.B. and D.B.'s third assignment of error well-taken. We remand this matter to the probate court for a best-interests hearing at which the parties may present any evidence pertinent to the issue of the best interests of the children that was not already presented during the consent hearing. The court must then independently analyze whether, under R.C. 3107.161, adoption by T.B. and D.B. is in the best interests of J.G. and K.W.

### III. Conclusion

{¶ 111} We find T.B. and D.B.'s first assignment of error not well-taken. The probate court properly concluded that the home study had not been approved. While the

38.

appropriate box on the form was not checked, the assessment specifically stated that an adoptive placement with T.B. and D.B. was not being recommended.

{¶ 112} We find T.B. and D.B.'s second assignment of error not well-taken. The probate court did not abuse its discretion in concluding that LCCS's consent for T.B. and D.B. to adopt the children was not withheld unreasonably.

{¶ 113} We find T.B. and D.B.'s third assignment of error well-taken. The probate court told the parties that it was bifurcating the issues of consent and best interests, but then denied their adoption petition without permitting them to submit additional evidence pertaining to the best interests of the children. The court was required to independently consider the best-interests factors despite finding that LCCS did not withhold its consent to adoption unreasonably.

{¶ 114} We affirm, in part, and reverse, in part, the January 6, 2020 judgments of the Lucas County Court of Common Pleas, Probate Division. We remand this matter to the probate court for a best-interests hearing at which the parties may present any evidence pertinent to the issue of the best interests of the children that was not already presented during the consent hearing. The court must then independently analyze whether, under R.C. 3107.161, adoption by T.B. and D.B. is in the best interests of J.G. and K.W.

{¶ 115} LCCS is ordered to pay the costs of this appeal under App.R. 24.

39.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____

                                                            JUDGE

Christine E. Mayle, J.          

                                      _____

Gene A. Zmuda, P.J.                                          JUDGE
CONCUR.

                                      _____
                                         JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.